Noreen **KASTNER, et al., Appellants,**

v.

**BEECH AIRCRAFT CORPORATION, Respondents.**

**No. WD 33273.**

Missouri Court of Appeals, Western District.

March 8, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied May 3, 1983.

Application to Transfer Denied May 31, 1983.

---

Heywood H. Davis, John A. Vering, III and James E. Cooling, Kansas City, for appellants; Dietrich, Davis, Dicus, Rowlands & Schmitt and Happy, Cooling & Herbers, Kansas City, of counsel.

Reed O. Gentry, Douglas N. Ghertner, Kansas City, for respondents; Field, Gentry, Benjamin & Robertson, Kansas City, of counsel.

Before PRITCHARD, P.J., and MANFORD and NUGENT, JJ.

PRITCHARD, Presiding Judge.

In their action for the wrongful death of Rick Kastner, appellants, Noreen Kastner, his surviving spouse, and his surviving minor children, Frederick, Brian, David and Evan Kastner, had a jury verdict for $1,000,000 against Beech Aircraft Corporation. The action was brought under the theory of strict liability—a failure to warn of the danger of a Beech Baron aircraft to go into a flat spin, the theory being submitted in Instruction No. 8, which is:

"Your verdict must be for plaintiffs Noreen Kastner Hendley, Frederick Kastner, Brian Kastner, David Kastner and Evan Kastner against defendant Beech Aircraft Corporation if you believe:

First, plaintiffs were the spouse and children of decedent Rick Kastner, and

Second, defendant Beech Aircraft Corporation sold the Beech Baron Model 95–A55, N9567Y, in the course of defendant's business, and

Third, the Beech Baron Model 95–A55, N9567Y, was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and

Fourth, defendant did not give an adequate warning of the danger, and

Fifth, the Beech Baron Model 95–A55, N9567Y, was used in a manner reasonably anticipated, and

Sixth, Rick Kastner died as a direct result of the Beech Baron Model 95–A55, N9567Y, being sold without an adequate warning. MAI 25.05 (1978) (Revision) Modified per MAI 2.00 and MAI 20.01 (1981 Revision) Submitted by Plaintiffs Kastners."

The trial court granted Beech a new trial on the single assigned ground that it was error not to have modified Instruction No. 8, to include a tail clause (as to appellants' damages for wrongful death of their decedent) that appellants had not been fully compensated by payment to them on behalf of other alleged joint tort feasors. The record shows that appellants had been paid $80,000 by Vanguard Insurance Company in settlement of their claims against the owners of the Beech Baron, the instructor pilot, Claude H. McNabb, and his employer, Wilson Aviation Academy. In granting the new trial, the trial court noted that the phraseology "for which they have not been fully compensated" is required by MAI 7.01 [1], and its omission represents error. In ruling the matter, the trial court went on: "It is true that the jury was correctly instructed that it must deduct $80,000 from any damages that the Kastners had sustained. It is equally true that the jury felt that those damages greatly exceeded the $80,000 which had been paid by its verdict of $1,000,000. Under these circumstances, it is difficult to perceive prejudice to the defendant; however, the Supreme Court case of *Hunter v. Norton*, 412 S.W.2d 163, controls." Beech defends its grant of a new trial essentially for the same reasons stated by the trial court, but argues further that the omission of the clause from Instruction No. 8, and its inclusion in damage Instruction No. 10 created an "inconsistency" under *Hunter v. Norton*, 412 S.W.2d 163 (Mo. 1967), which was prejudicial to it in that

---

1. MAI 7.01 was withdrawn, effective January 1, 1983, and new MAI 1.06 was then adopted: "No instruction shall be given directing the jury to credit its verdict with the amount of any advance payment or partial settlement." See 632 S.W.2d XXIX.

irreconcilable and contradictory directions were presented to the jury by these two instructions. Instruction No. 10 in pertinent part is: " * * * After you have determined such sum [as will fairly and justly compensate plaintiffs for their damages], you must deduct $80,000 which has been paid to plaintiffs * * *. In the event such payment is equal to or exceeds the amount of plaintiffs' damage, then your verdict must be for defendant. * * *" [Brackets added.]

■ Appellants contend that Instruction No. 8 was a proper modification of MAI 25.05 (the strict liability form), MAI 20.01 (the wrongful death form), and MAI 2.00 (to identify plaintiffs) because there is no exact MAI verdict directing instruction under which they submitted their case—wrongful death, strict liability—failure to warn. MAI 25.05 was modified to show death and not damages as a hypothesis. The question is, though, not whether there was a proper modification, but whether there was an improper deviation (omission) from MAI 7.01 [requiring credit for a settlement with a joint tort feasor], Notes on Use 2. "Modified Verdict Director. Add to the appropriate verdict directing instruction at the end of the paragraph hypothesizing that damage was sustained the phrase 'for which he has not been fully compensated.'" Appellants say that in this wrongful death case there was no "appropriate verdict directing instruction" because there is no "paragraph hypothesizing that damage was sustained." Note 2 of MAI 7.01 is inappropriate, they say, because paragraph Sixth of Instruction No. 8 hypothesized the death of Rick Kastner (not damage), and you go to Instruction No. 10 for the submission of the survivors' damage (which allowed credit thereon for the $80,000 settlement). Appellants are correct in their contention which is further buttressed by their cited cases with reference to MAI 20.01 holding that pecuniary loss need not be hypothesized because " 'where it appears in a statutory action for death that the death was caused by defendant's negligence, nominal damages may be recovered, although no actual pecuniary damage has been shown ....' 25 C.J.S.

§ 96, *quoted in Stroud v. Masek,* 262 S.W.2d 47, 51 (Mo.1953)." Committee's Comment (1981 Revision) to MAI 20.01. The law implies pecuniary loss from the legal duty of a deceased to support a wife and minor children, *O'Hara v. Lamb Const. Co.,* 200 Mo.App. 292, 206 S.W. 253, 254[1, 2] (1918); *Steinmetz v. Saathoff,* 84 S.W.2d 434, 437[5–7] (Mo.App.1935), "The law will imply pecuniary loss to her by reason of the negligent killing of her husband."; and see also *State ex rel. Kansas City Stock Yards v. Clark,* 536 S.W.2d 142, 149 (Mo. banc 1976), where it was said, " 'Judgment for nominal damages is a substantial right since such a judgment decides the incident of costs.' 262 S.W.2d 51. See also, *Acton v. Shields,* 386 S.W.2d 363[7] (Mo.1965). It is interesting to note that in cases such as the one before us the approved instructions do not require a finding that plaintiff suffered damage. See MAI 20.01 and 20.02. This was explained in the case of *Aubuchon v. LaPlant,* 435 S.W.2d 648, 652 (Mo.1968) as follows: 'In wrongful death actions, unlike suits for personal injuries, *the issue of whether plaintiff has proved pecuniary loss (damages) is not hypothesized in plaintiff's verdict directing instructions.* See MAI 20.-01 and 20.02. The reason for this, as set out in the Committee's Comment to MAI 20.01, is that nominal damages may be recovered in such a case as this even though actual damage is not sustained.' " [Italics added.]

■ *Hunter v. Norton,* 412 S.W.2d 163 (Mo.1967), cited by the trial court and here relied upon by Beech, is distinguishable. The *Hunter* case was one for *damages for personal injury,* and necessarily the verdict directing instruction was required to submit the issue that *damages resulted* from the hypothesized negligent acts of defendants. Thus, as properly held, the verdict directing instruction, omitting the phrase "the plaintiff sustained damage for which he has not been fully compensated by Percy Reed", was held to be inconsistent with one following MAI 7.01 giving credit for a satisfaction or partial satisfaction by settlement with a joint tort feasor. Here, under the *Kansas City Stock Yards* case, supra, and cases

cited, it is *not* required that appellants, as surviving members of the immediate family, submit their damages—i.e., pecuniary loss, for a finding by the jury. The only issue for the jury was that the death of appellant's decedent ensued from the failure to warn of the dangerous propensities of the aircraft to go into a flat spin. Thus, there is no deviation at all from MAI in the giving of Instruction No. 8, and the grant of a new trial on that basis was error. Beech got all that it was entitled to by Instruction No. 10, authorizing the jury to deduct the $80,000 settlement with the joint tort feasor from the amount found as appellants' damages. Appellants followed the form of MAI 20.01, as they were required to do. But even assuming that there was a practical inconsistency in that prescribed MAI, it is difficult to see where Beech was prejudiced. Appellants' evidence of economic loss alone ranged from $1,008,053 to $1,084,180, not counting any damage resulting from their loss of a husband and father. The jury's verdict, even after discounting the $80,000 settlement, was within the range of the evidence of economic loss. Furthermore, Beech's own expert testified that appellants' economic loss exceeded $300,000, which would be far in excess of the amount of the settlement.

■ Beech asserts other grounds, presented to the trial court, which it says would justify the grant of a new trial. It is further contended, first, that the trial court erred in omitting from Instruction No. 10, the requirement of MAI 7.01 that the name of the joint tort feasor who paid the plaintiff be specified. Shortly before trial, certain crossclaims of parties were dropped, and there remained appellants' claim for wrongful death, Bettie McNabb's claim as executrix of the estate of Claude H. McNabb, deceased (the instructor in the Beech Baron) for wrongful death, and a claim of Vanguard Insurance Company for hull damage to the Beech Baron, which it insured and paid to its owners, all against Beech. Vanguard paid the $80,000 settlement to appellants on behalf of the originally named defendants, McNabb's estate, the owners of the aircraft, and McNabb's

employer, and appellants' claims against them were dismissed with prejudice. The claim of Bettie McNabb, executrix, was tried and resulted in a $400,000 judgment for her against Beech. Vanguard also recovered judgment on its hull damage claim against Beech for $29,500. These latter judgments were satisfied and are not in issue here. Obviously, any inclusion that the settlement was paid, at least in part, on behalf of Claude H. McNabb's estate would have been prejudicial to Bettie McNabb's claim against Beech because it could be construed as an admission of his negligence, as the instructor, in causing the aircraft to crash. The trial court had much pre-trial discussion about this dilemma, and concluded that the name of the person who paid the partial settlement should be deleted. Counsel for Beech accepted that conclusion by saying to the court, "I'll accept that." The matter, however, need not be further pursued because Beech requested that Instruction No. 10 be given, which it was, without identifying the payor of the settlement. It may, therefore, not claim prejudicial error based on its own instruction. *McDowell v. Schuette,* 610 S.W.2d 29, 36[4] (Mo.App.1980), and cases cited; *Parsons Construction Co. v. Missouri Public Service Co.,* 425 S.W.2d 166, 171[3] (Mo.1968), and cases cited. Beech's contention is therefore ruled against it.

■ Beech's second further contention is that the trial court erred in orally telling the jury that "As evidentiary matter, we advise you that the law of Missouri judicially notes that the average reaction time of an individual is three-fourths of a second." The matter came up during the direct and cross-examination of Beech's expert witness, pilot Dale Ruhmel. He performed single engine stall tests in a Beech Baron which was specially equipped with a sophisticated air speed indicator, an acceleration measuring device, video equipment, and tufts (pieces of yarn) taped to the wing which would show visually a stall situation. Ruhmel testified at one point that he was demonstrating engine chops at the published VMC (velocity minimum control or minimum control speed), but on cross-examination, it was brought out that he was demon-

strating stalls at 15 miles per hour above the actual VMC, which was outside the danger zone that the pilot loses directional control. He was also doing the tests at 8,000 feet. (A witness put the altitude of McNabb and Rick Kastner at 3,000 to 3,500 feet, and there was no evidence that they were demonstrating or practicing single engine stalls or chops. It was not contended that the Ruhmel video film of his tests was duplicative of any conditions existing at the time of the crash.) Ruhmel then testified that a student pilot should react to a situation involving an engine chop in one-fourth of a second or less, and further, "Typical pilot reaction times are on the order of a tenth of a second. They can, in fact, be higher or lower, depending on the test and how tense they are, really for that test." Appellants' request at that time that the court judicially know what reaction time was, was declined, but the court, at the close of the evidence, did give the jury the above oral advice.

Beech argues that "Essential to the determination of 'adequate warning' was evidence concerning knowledge available to the aircraft pilot that a spin of the aircraft could ensue, and his ability, thereafter, to take adequate measures to avoid the aircraft entering a spin." It should be noted that there was no specific evidence of the reaction times of either Rick Kastner or McNabb, and Ruhmel's tests were performed under conditions that he would be forewarned of an impending stall and thus any reaction time would be shortened by reason of his anticipation that a stall would occur. It is interesting to note that in a letter of Beech's vice president it was stated that an applicant for twin-engine training has likely never had training in spin recovery, and under that situation he would "be confused and disoriented for a considerable period of time before he realizes what had happened, much less what corrective action is required." There is no evidence that deceased had been trained in spin recovery methods or that he had any reason to anticipate the Beech Baron going into a flat spin. Appellants' theory was that the aircraft had a dangerous propensity to go into a flat spin, and that Beech failed to warn adequately of that propensity, the dangerous results of such a spin, the methods for avoiding it as by maintaining sufficient speed, the altitude that should be maintained for stall demonstrations, and the procedure for recovery from a flat spin. Neither Ruhmel's testimony as to reaction time nor the trial court's oral statement to the jury as to average reaction time had any relevance to the issue of adequate warnings, because if the pilots did not know of the aircraft's propensity to go into a flat spin under the circumstances, or how to get out of it, reaction time would be of no consequence. The only significance of a reaction time in this case would be the pilot's opportunity timely to avoid the consequences of a stall and a flat spin which could only go to an issue of contributory fault. Beech did not submit that issue, quite apparently because there was no evidence to support it. The trial court was correct in its ruling on this ground contained in the motion for new trial: "The evidence as to reaction time was very much collateral and was not material to any of the issues in the case, and the Court does not perceive prejudicial error which would require the granting of a new trial." In *Phillips v. Vrooman*, 251 S.W.2d 626, 630 (Mo.1952), it was said, " 'Indeed, no matter what the ground may be upon which it undertakes to act, a trial court is never justified in setting aside a verdict except for error prejudiced to the losing party.' (Citing case)." Beech's second additional ground for the grant of a new trial is overruled.

■ By its last (Points IV and V) additional grounds to support the grant of a new trial, Beech contends that the trial court erred in receiving into evidence reports of accidents compiled by the National Transportation Safety Board (NTSB). These were Exhibits 104, 105, 106 and 107, which are entitled, "Factual Aircraft Accident Report"; Exhibit 86, entitled "Special Study General Aviation Stall/Spin Accidents"; and page 3 of Exhibit 102 (102A) concerning recommendations of NTSB to install placard warnings in Beech Baron Aircraft of the dangers of and prohibiting intentional single-engine stalls, more rigor-

ous test requirements with regard to the potential detection of an airplane's propensity to display any undue spinning propensity, dissemination by Beech of information relating to the Baron's single-engine stall speeds and operational conditions and limits where flight at published value of VMC is not possible, a certification review team to explore and evaluate relative margins of safety in low-speed, high-power, single-engine operations, and retrofitting Baron aircraft with aerodynamic air flow kits or components and other modifications. Beech first says that the admission of these documents violated the prohibition of 49 U.S.C.A. § 1441(e) as to the use of records and reports (of NTSB) as evidence. That section has been construed as being inapplicable to factual evaluations in reports—so long as there is no conclusion in the reports as to the probable cause of accidents. See 49 C.F.R. § 835.2, et seq.; *Murphy v. Colorado Aviation, Inc.,* 41 Colo.App. 237, 588 P.2d 877, 882, et seq. (Colo.App.1978), holding that it was proper for an NTSB investigator to give testimony based upon an NTSB factual report which did not contain an ultimate conclusion as to probable cause of the accident; *Todd v. Weikle,* 36 Md. App. 663, 376 A.2d 104, 111 (Md.Ct.Spec. App.1977); *Kline v. Martin,* 345 F.Supp. 31, 33 (E.D.Va.1972); *Berguido v. Eastern Airlines, Inc.,* 317 F.2d 628, 632 (3rd Cir.1963); and *Benna v. Reeder Flying Serv., Inc.,* 578 F.2d 269, 272 (9th Cir.1978). The exhibits here have been examined and not one contains any reference to a probable cause of the instant or any other accident. Under the foregoing cases, Beech's reliance on the exclusionary provisions of 49 U.S.C.A. § 1441(e) is without substance.

■ Page 3 of Exhibit 102 (102A), supra, refers to NTSB's recommendations to the FAA, as above set forth concerning the Beech Baron, and is obviously within the purview of the duties prescribed for NTSB under 49 U.S.C.A. § 1441(a), supra. That exhibit came into evidence in this manner: Appellants' expert witness, Puckett, testified on cross-examination that FAA had found no problem with the Beech Baron when it was tested in February, 1976, which was after the McNabb/Kastner crash of July 15, 1974. Puckett also acknowledged that FAA did not believe that further flight testing on the aircraft was required because that testing confirmed prior data as to its meeting FAA certification requirements as to single engine stalls and undue spinning tendencies. Then appellants' expert witness, Dr. Craig, testified that the Beech Baron had an undue spinning tendency, and that pilots should be warned of that danger. He did acknowledge on cross-examination that federal regulations did not define undue spinning tendency. It was, however, his expert opinion that the aircraft had an undue spinning tendency, which opinion was not the FAA interpretation of the regulations. This further cross-examination ensued: "Q. And you know that the FAA does not agree with you on this subjective recitation of yours about undue spinning tendency. You know that, don't you? A. They have never revoked the type certificate, they have never in print they have never agreed with me. That's fair to say. Q. That is a fair statement. And that is true and you know, in fact that even on occasion after review that they have not agreed with your interpretation. A. Yes. Q. Okay. So, it's you against the FAA. A. I think I'm not standing by myself." Thereafter, counsel for McNabb and Vanguard Insurance Company sought to introduce NTSB's recommendations to show it stood with him against the FAA, and the court held that Beech opened and invited it. Then, Dr. Craig testified that NTSB stood with him on the question of undue spinning as reflected in its recommendations. It thus appears that the document was cumulative to the testimony of Dr. Craig; it was properly admitted to rebut the adverse inference from the cross-examination that it was he against the FAA; and it was further admissible as a record of performed duties of the NTSB under 49 U.S.C.A. § 1441(a), as held herein, infra.

■ Beech says that Exhibit 86, and the other exhibits, were inadmissible hearsay evidence. Exhibit 86, containing portions of the Special Study on Stall/Spin Accidents of NTSB for the years 1967–1969, has the authentication by signature of its custodian, and there is affixed NTSB's seal. It

is thus properly authenticated under § 490.-220, RSMo 1978, as being admissible in evidence. 49 U.S.C.A. § 1441(a) sets forth the duties of NTSB to make rules and regulations governing notification and report of accidents involving civil aircraft; to investigate accidents and report the facts, conditions, and circumstances thereof; to make recommendations to FAA as will tend to prevent similar incidents; to make the reports public; and to ascertain what will be best to reduce or eliminate the possibility of, or recurrence of, accidents by conducting special studies and investigations on matters pertaining to safety in air navigation and the prevention of accidents. The only portions of Exhibit 86 which were read to the jury were three lines each from two pages which showed the stall/spin statistics for the two years for three comparable light twin-engine aircraft—the Beech Baron, the Cessna 310, and the Piper PA 30. Although the statistics shown may be the result of a gathering of various sources of aircraft accidents involving stalls/spins, and thus technically of a hearsay nature, the overriding concern of 49 U.S.C.A. § 1441, and § 490.-220 [see also Fed.R.Evid., 803(8)(B), 28 U.S.C.A.], is to provide for the dissemination and consideration of these elements of public safety in the operation and proper design of aircraft. Significant in this regard is the use of Beech of various NTSB and FAA special studies publications, kept in its own files, and its participation in NTSB accident investigations, and its concession, per the testimony of its accident investigation team member O'Dell, that in order to classify an accident as a stall or spin, he would have to go to the NTSB report (thus Beech itself considers matters of a possible hearsay nature). Beech is thus not to be heard to complain that the jury was permitted to consider hearsay aspects of documents which were generally admissible under the statutes upon proper authentication. It is noted that none of these reports concerned any of the facts of the present Kastner-McNabb accident, but were offered and received for the purpose of establishing that Beech had knowledge of the spin propensities of the Beech Baron, and official recommendations for the avoidance of the same, which would give rise to the duty to give adequate warnings thereof. See *White v. St. Louis-San Francisco Railway Co.,* 602 S.W.2d 748, 753[2] (Mo.App.1980), where plaintiff's notations made by him on the back of time records were the same as made on federal work reports which had been destroyed, were held admissible to show notice to defendant of inadequate padding on the locomotive. In the there cited case of *Rinker v. Ford Motor Co.,* 567 S.W.2d 655 (Mo.App.1978), a report listing previous instances of the same type of defect as claimed (a defective carburetor cam) was admitted to show knowledge on the part of defendant of the allegedly defective part. The trustworthiness of the exhibit, and all of them relating to reports of aircraft accidents, are not only demonstrated by Beech's use of them, but in this statement in 30 Am.Jur.2d Evidence § 991, p. 121: "Generally stated, the rule is that all records and reports prepared by public officials pursuant to a duty imposed by law, or required by the nature of their offices, are admissible as proof of the facts stated therein, so far as they are relevant and material to the particular inquiry, under an exception to the hearsay rule, * * *. This exception to the hearsay rule rests in part upon the presumption that a public officer charged with a particular duty has performed it properly, and upon the fact that public officers usually have no motive to suppress or distort the truth or to manufacture evidence. The extraordinary degree of confidence reposed in such records and reports is founded principally upon the circumstance that they have been made by authorized and accredited agents appointed for the purpose; those who are empowered to act in making such investigations and memorials are in fact the agents of the individuals who compose the public." Neither Exhibit 86, nor any of the other NTSB factual reports of accidents, were inadmissible, and Points IV and V are ruled against Beech.

The judgment is reversed and the case is remanded with directions to reinstate the verdict of the jury as of the date rendered, July 16, 1981, and for costs.

All concur.

PER CURIAM:

In a part of its motion for rehearing (but not its application to transfer to the Supreme Court) Beech says that the opinion herein incorrectly holds that Exhibits 104, 105, 106 and 107, which were reports of circumstances of accidents occurring *after* the Kastner accident, established *knowledge* of the spin propensities of the Beech Baron. As to these exhibits, Beech is correct, and the opinion is modified to the extent that these exhibits, in themselves, do not establish such knowledge. These four exhibits were admissible for another legitimate purpose: to prove up the Kastners' theory that there was an unreasonably dangerous spin characteristic of the Beech Baron and that it continued in the marketplace as an unreasonably dangerous product, all to show causation and to rebut any issue of contributory fault. The foundation for the admission of the four exhibits for that purpose was developed from witness Dr. Craig outside the hearing of the jury. The reports were of accidents at Provincetown, Massachusetts; Acuff, Texas; Jarrell, Texas; and Cumming, Georgia, which four were the most likely to be similar in circumstances to the Kastner accident: The four aircraft were similar and had not been modified; at least two had impacted in a flat spin, others in more normal spins; the weather conditions were similar; the aircraft were seen at similar altitudes in a spin; and probably there was some instructional or pilot practice of simulated or actual single engine operation. The trial court determined that sufficient similarities existed, and the four exhibits, supra, were never given to the jury for perusal. Dr. Craig, however, referred to the exhibits during the course of his testimony before the jury.

Exhibit 86, a report of a Special Study on Stall/Spin Accidents of NTSB, was not made after the Kastner accident, but was for the years 1967–1969. There was also an Exhibit 92, not mentioned in the opinion, which was a summary of a statistical study of stall/spin accidents, but covered the years 1964–1972. Exhibit 86 showed the stall/spin statistics of the Beech Baron to be worse than the comparable Cessna 310 and the Piper PA 30. Exhibit 92, admitted into evidence without objection from Beech, showed that the Beech Baron's stall/spin accident record was worse than the Cessna 310, and not quite as bad as the Piper PA 30. The jury could find that Beech had knowledge of previous stall/spin characteristics, not only from the evidence from O'Dell, but also from the admission of William H. Schultz, Beech's manager of Technical Engineering and FAA Liaison, that it maintains files of various NTSB and FAA special studies, kept down the hall from the office of Beech's Manager of Technological Engineering. This evidence clearly gives rise to an inference of knowledge of the spin characteristics of the aircraft which would in turn give rise to the duty to make adequate warnings thereof.

Other matters raised in the motion for rehearing and the alternative motion to transfer to the Supreme Court have been considered. The motion for rehearing is overruled, and the motion to transfer to the Supreme Court is denied.